UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| GEORGES RIVER ENERGY, LLC, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | ) <br> ) Civil Action No. _____ |
| KMW ENERGY, INC. | ) <br> ) |
| Defendant. | ) <br> ) <br> ) |

## COMPLAINT

Without waiving any right it may have to demand and submit to arbitration any of the claims set forth in this Complaint, and without waiving its right to assert claims against Liberty Mutual Insurance Company as performance bond surety, Plaintiff Georges River Energy, LLC hereby complains against Defendant KMW Energy, Inc. as follows:

1. Plaintiff Georges River Energy, LLC ("GRE") is a Maine limited liability company with a principal place of business located in Searsmont, Maine.

2. Defendant KMW Energy, Inc. ("KMW") is a Canadian corporation with a principal place of business located in London, Ontario, Canada.

## JURISDICTION AND VENUE

3. Jurisdiction over this action is conferred by 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in dispute is in excess of $75,000.

4. Venue within the District of Maine is appropriate because the claims set forth herein involved the construction of a biomass plant in Searsmont, Maine.

## **FACTUAL BACKGROUND**

5.     Robbins Lumber Company ("Robbins"), a Maine corporation, is a fifth generation family-owned business that was established in 1881 and operates a sawmill on a 40-acre site in Searsmont, Maine.

6.     Robbins' operations have, for many years, included a 1.2 megawatt co-generation plant that generated electricity for operations and steam for use in Robbins' kilns to dry lumber and provide heat for the facility.

7.     In 2016, Robbins embarked on a project to construct a new co-generation plant that, like its historical co-generation plant, would supply electricity and steam to operate its lumber drying kilns and heat for its buildings (the "Project").

8.     A critical factor in planning the Project was to use the mill residuals, such as sawdust, bark and chips, as fuel.  This would provide a market for by-products from independent loggers, landowners and other sawmills which previously had gone to many of Maine's now-shuttered paper mills.

9.     The Project was to be owned and operated by Plaintiff GRE, a separate entity affiliated with Robbins.

10.    As part of the Project, GRE planned to purchase and install an 8.5 megawatt steam turbine.  GRE planned to sell electricity back into the electrical grid pursuant to a power purchase agreement (the "Power Purchase Agreement") entered into with Central Maine Power Company.  In addition, Robbins planned that, upon completion of the Project, it would cease to operate its existing biomass system that was supplying steam to Robbins' dry kilns.

11. On or about December 6, 2016, Robbins entered into a contract (the "Contract") with KMW pursuant to which KMW was to provide labor, materials, equipment and services, including professional design services, for the design, engineering and supply of a biomass fired energy system ("System") including a steam turbine and generator. The Contract Price for the System was $12,825,000 USD.

12. As required by the terms of the Contract, KMW supplied a certain performance bond designated as bond no. BDTO-15002-016 ("Bond") guaranteeing its performance of the Contract.

13. Liberty Mutual Insurance Company ("Liberty") is the surety on the Bond. The penal sum of the Bond is 50% of the Contract price or $6,412,500 USD.

14. Under the terms of the Bond, Liberty is jointly and severally liable with KMW for full performance of all of KMW's obligations under the Contract. Specifically, the Bond states:

> [KMW] and [Liberty], jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to GRE for the performance of the Contract, which is incorporated herein by reference.

15. In addition to the Bond, Liberty also issued a certain Architects, Engineers & Environmental Services Professional Liability Policy (the "Professional Liability Policy") to cover professional design errors by KMW.

16. KMW is the insured under the Professional Liability Policy.

17. The System designed by KMW was to be comprised of a boiler (essentially a furnace) that would burn biomass fuel (primarily wood chips) to heat water to generate high-pressure steam. The steam would be used to power a steam turbine and generator designed and supplied by KMW to generate electricity. After passing through

the turbine, the steam would be piped to Robbins' kilns to supply heat to dry its lumber products and heat its buildings.

18. KMW agreed that the co-generation System it designed would meet certain specific design criteria. Specifically, KMW promised that it would design the turbine such that it would generate 8.5 megawatts of electricity while providing steam for Robbins' dry kilns and building heat all the while meeting certain efficiency and emissions standards.

19. During the design phase of the Project, KMW recommended that its design include a steam turbine designed and manufactured by Chola Turbo Machinery ("Chola") located in Bangalore, India (the "Turbine" or the "Chola Turbine").

20. KMW represented to GRE that "Chola Turbo Machinery Turbines are extensively proven and have been approved by General Electric."

21. Based on KMW's assurances, GRE reasonably believed that the Chola Turbine as designed by KMW and Chola would meet the requirements of the Contract specifically including the performance criteria that KMW agreed to meet.

22. GRE expected that the completed Project would result in a net savings of the cost to generate electricity and steam through a combination of a more efficient system and revenue generated from the Power Purchase Agreement.

23. Under the Contract, KMW agreed to deliver the Turbine and generator on or before December 19, 2017.

24. KMW delivered the Turbine several months late, on or about March 20, 2018. Upon delivery, the Turbine was installed by GRE's contractor working under KMW's direction and put through a commissioning and start up process by KMW.

25. Operation of the System commenced in October 2018. The Turbine began to generate electricity on November 28, 2018.

26. Almost immediately after the Turbine was put in service and began operating, it became clear that there were significant problems with the Turbine.

27. Among other things, the Turbine failed to generate electricity in the quantity required by the Contract. In addition, after passing through the Turbine, there was insufficient steam left over to supply Robbins' kilns.

28. Because the System failed to generate sufficient steam, Robbins was forced to continue operating its existing biomass system in conjunction with the new System to operate its kilns and provide heat for its buildings. As a direct result, Robbins' actual operating costs with the new System are greatly in excess of its anticipated operating costs.

29. In addition, because the Turbine failed to generate as much electricity as anticipated, GRE was unable to sell power and generate anticipated revenue through the Power Purchase Agreement.

30. During the first half of 2019, KMW and GRE undertook significant efforts to investigate the problems with the System.

31. KMW hired a series of consultants that attempted over a period of several months to solve the problems with the Turbine.

32. KMW's consultants were unable to solve the problems with the Turbine such that the Turbine would achieve the performance requirements set forth in the Contract.

33. Because KMW and its consultants were unable to solve the problems with the Turbine, GRE hired MD&A Turbine Consultants ("MD&A") to inspect and evaluate the Turbine's operations.

34. In its report dated May 2, 2019, MD&A concluded that the Turbine was non-conforming stating:

> To date, the steam turbine has not operated at full power for more than several minutes to determine its maximum MW output. The time duration was too short to collect steady data to measure actual efficiency, but preliminary data at partial loads shows a much higher energy input is needed per a unit of output, than specified. As KMW and Chola continue to search for solutions to the known problems for which they are solely responsible, the steam turbine's ultimate operational status is unknown. The following conclusions are based on the information identified in this report and are subject to change as KMW and its steam turbine supplier, Chola, make changes and more information becomes available.
>
> *For the reasons explained below, the steam turbine supplied by KMW does not comply with the requirements of the KMW Contract. It does not comply with industry standards or the performance requirements identified in the KMW Contract. Its operation to date has been unreliable and neither KMW nor Chola have been able to fix this problem. Therefore, the steam turbine is not acceptable and should be replaced with a properly manufactured steam turbine that conforms to the requirements of the KMW Contract.*

(Emphasis added).

35. MD&A also concluded, among other things: that the Turbine castings were substandard in material properties and thickness and that as a result could lead to failure, serious injury and death; that the Turbine electrical output was deficient and limited to only 85% of output guaranteed by KMW; that the Turbine had a poor performance record with numerous parts requiring replacement within a short time after it began to operate; and that Turbine manufacturer, Chola, lacked the engineering expertise to correct the problems with the Turbine.

6

36. In light of the MD&A Report, on May 3, 2019, GRE formally notified "*KMW that it [was] rejecting the Turbine as a non-conforming good and requiring it be replaced with a new steam turbine that conforms to the industry standards and the requirements of the [Contract]*."

37. In early June 2019, GRE requested that the Project Engineer, Mid-South Engineering Company ("Mid-South"), "serve as Engineer in a decision-making process related to [GRE's claim] of non-conforming goods."

38. Following its review of the MD&A report, Mid-South offered KMW an opportunity to respond to the conclusions set forth in the MD&A report.

39. Following its review of the MD&A report and KMW's purported rebuttal, Mid-South concluded on June 14, 2019, that the Turbine failed to conform to the requirements of the Contract.

40. Specifically, Mid-South concluded that KMW's design of the Turbine was deficient because, among other things: (1) KMW applied the wrong industry standards for pressure and temperature in the design of the Turbine; and 2) KMW selected the wrong kind of metal for construction of the Turbine casing.

41. KMW failed to respond or object to Mid-South's determination.

42. Under the terms of the Contract, the:

> Engineer's written decision on such Claim will be final and binding upon Buyer and Seller fifteen (15) days after it is issued unless within fifteen (15) days of issuance Buyer or Seller appeals Engineer's decision by initiating dispute resolution of such Claim in accordance with the procedures set forth in Article 13.

43. KMW failed to respond or object to Mid-South's decision on GRE's claim that the Turbine was non-conforming.

7

44. Accordingly, the Turbine's non-conformance has been conclusively established under the terms of the Contract.

45. In addition, GRE has learned that the System fails to meet the emissions criteria set forth in the Contract.

46. KMW has admitted that the Turbine was non-conforming and did not perform in accordance with the terms of the Contract.

47. GRE provided timely notice to KMW regarding its claims, including those for professional negligence associated with the Turbine's design defects.

48. Upon information and belief, timely notice was provided to Liberty under the Professional Liability Policy.

49. On or about July 8, 2019, KMW promised in writing that it would replace the non-conforming Turbine with a conforming turbine.

50. On or about July 14, 2019, after agreeing to replace the non-conforming Turbine, KMW provided GRE with a preliminary schedule for the replacement of the Turbine.

51. KMW's schedule identified the basic phases of the replacement effort, starting with steps needed to identify possible suppliers for the new turbine, contacting potential suppliers, arranging site visits, soliciting proposals and selecting a supplier, issuing a purchase order, and manufacturing and installation time.

52. Based on that schedule, GRE expected that the new turbine would be commissioned and producing power and steam in accordance with the Contract no later than December 31, 2020.

53. KMW's schedule was predicated on placing an order for the replacement turbine by October 17, 2019.

54. GRE and KMW subsequently agreed to extend the deadline for ordering the new turbine to November 15, 2019.

55. GRE and KMW reviewed proposals submitted by three replacement turbine manufacturers including Siemens ("Siemens"), Fincantieri S.p.A. ("Fincantieri"), and WEG-TGM ("TGM").

56. KMW concluded that Siemens and TGM were unable to supply a turbine that met certain specific requirements set forth in the Contract.

57. Accordingly, KMW determined that it would purchase the replacement turbine from Fincantieri, a manufacturer of steam turbines based in Italy.

58. On January 20, 2020, KMW issued its purchase order to Fincantieri in the amount of €1.895 million for a replacement for the rejected, non-conforming Chola Turbine ("Purchase Order").

59. The parties scheduled a kick-off meeting for February 25-26, 2020, among Fincantieri, KMW and GRE to finalize engineering details for the replacement turbine.

60. KMW failed, without explanation, to include in the Purchase Order certain critical equipment and services that KMW had agreed to supply under the Contract including a spare rotor, various spare parts and engineering support.

61. These now excluded items had been supplied by KMW under the Contract for the Chola Turbine and are critical to the proper operation and maintenance of the new turbine.

62. Following late delivery of the Turbine by KMW, and as the failings of the Turbine became known, GRE provided written notification of its accruing damages and claims against KMW on multiple occasions.

63. On numerous occasions, KMW agreed in writing that it would be responsible for costs incurred by GRE due to the Turbine's non-conformance.

64. Subsequent to issuing the Purchase Order to Fincantieri, KMW threatened to rescind the Purchase Order unless GRE agreed to a financial settlement of its accruing damages claims against KMW.

65. In other words, KMW sought to leverage GRE's need to have a functioning turbine in order to compel GRE to compromise its valid claims for damages arising from KMW's failure to deliver a functioning turbine in the first instance, including those claims to which KMW had already agreed.

66. By letter dated February 4, 2020, GRE notified KMW and Liberty that GRE was "*considering declaring [KMW] in default under the terms of the [Contract] . . ..*" Such notice was required under the Bond prior to termination of the Contract with KMW.

67. As required by the Bond, Liberty, KMW and GRE participated in a conference (via telephone) on February 18, 2020, to discuss KMW's performance failures under the Contract and the reasons for GRE's notice of default.

68. As planned, representatives of Liberty, Fincantieri and KMW met with GRE at its Searsmont, Maine, facility during the week of February 25 and 26, 2020, to finalize engineering details for the replacement turbine. Upon information and belief,

Fincantieri also expected to finalize the commercial terms for payment of the replacement turbine by KMW.

69. At these meetings, Fincantieri provided notice at that time that it would not continue efforts to engineer and manufacture the replacement turbine unless KMW finalized payment terms.

70. Due to KMW's failure to finalize the payment terms for the replacement turbine, its failure to commit to purchasing critical spare parts and engineering support, and KMW's threats to either suspend work on the replacement turbine or cancel the order, GRE concluded that KMW was unwilling or financially unable to accomplish the replacement as required by the Contract.

71. On April 8, 2020, GRE again notified Liberty of its intention to terminate the Contract with KMW for default.

72. On April 10, 2020, KMW filed for insolvency protection in the Ontario Superior Court of Justice (In Bankruptcy and Insolvency) in Ontario, Canada.

73. On May 15, 2020, the Ontario Superior Court of Justice granted GRE's motion for relief from the automatic stay imposed as a result of KMW's bankruptcy filing such that GRE was permitted to declare KMW in default of, and formally terminate, the Contract.

74. On June 2, 2020, GRE issued a notice to KMW and Liberty that KMW was "in material breach of the terms of the Contract due to its non-conforming goods." GRE reserved its rights to terminate the Contract following a seven-day period unless KMW cured its material breach.

75. KMW failed to cure its material breach and GRE formally terminated the Contract on June 12, 2020.

76. In an order dated June 22, 2020, the Ontario Superior Court of Justice granted GREs motion for relief from the automatic stay imposed as a result of KMW's bankruptcy filing such that GRE was permitted to "commence and prosecute an action against KMW provided however, that, absent further order of the Court, GRE's sole recourse with respect to any such judgement obtained shall be limited to the proceeds" of the Professional Liability Policy issued by Liberty.

77. This action is being commenced for the purposes permitted by the Ontario Superior Court of Justice's June 22, 2020, order.

78. As a result of KMW's failure to supply a conforming turbine, GRE has incurred and continues to incur substantial financial impacts. GRE estimates that its damages will exceed $10.7 million consisting of liquidated damages for late delivery of the Turbine, direct costs to evaluate, repair and replace the turbine, and operational losses due to the Turbine's deficient performance.

79. GRE's substantial damages mount each day that the non-conforming Chola Turbine remains in operation.

80. GRE has demanded that Liberty perform KMW's obligations, including KMW's obligations to replace the non-conforming Turbine and to pay GRE its damages, under the terms of the Bond. At this time, GRE is awaiting a decision from Liberty regarding how it intends to address such claims.

81. This action is without prejudice to GRE's claim against Liberty on the Bond.

## COUNT I – BREACH OF CONTRACT

82. GRE restates and incorporates by reference the allegations set forth in paragraphs 1 through 81 as if fully set forth herein.

83. GRE and KMW entered into a binding contract for the design, engineering and supply of the System.

84. KMW's conduct described above, including but not limited to, its failure to supply a conforming steam turbine, amounts to a material breach of contract.

85. As result of KMW's material breach of contract, GRE has incurred and continues to incur substantial damages.

86. All conditions precedent to the maintenance of this action have occurred or have been performed.

## COUNT II – BREACH OF WARRANTY

87. GRE restates and incorporates by reference the allegations set forth in paragraphs 1 through 86 as if fully set forth herein.

88. Under the terms of the Contract, KMW warranted and guaranteed that the Turbine would "conform with the Contract Documents, and with the standards established by any Samples approved by the Engineer."

89. KMW further acknowledged that "[I]t is responsible for the design of the Goods, has carefully reviewed the design and performance criteria provided by the Buyer, and that it shall be responsible for any nonconformity in the Goods or their design, unless such nonconformity results solely from change in the design or performance criteria established by [GRE]."

90. KMW's acts and omissions and the circumstances set forth herein constitute a breach of these and other warranties set forth in the Contract.

91. As a result of KMW's breaches of its warranty obligations, GRE has incurred and continues to incur substantial damages.

92. All conditions precedent to the maintenance of this action have occurred or been performed.

### COUNT III – PROFESSIONAL NEGLIGENCE/PROFESSIONAL MALPRACTICE

93. GRE restates and incorporates by reference the allegations set forth in paragraphs 1 through 92 as if fully set forth herein.

94. KMW had a duty to provide its professional services consistent with that degree of care and skill ordinarily exercised by members of the same profession currently practicing under the same or similar circumstances in the general locale of this project.

95. KMW breached its duty by failing to design a Turbine that complied with the performance criteria set forth in the Contract and met industry and professional design standards.

96. As a direct and proximate result of KMW's breach of its professional duties, GRE has incurred and continues to incur substantial damages.

97. All conditions precedent to the maintenance of this action have occurred or been performed.

Dated at Portland, Maine, this 12th day of August, 2020.

/s/ A. Robert Ruesch
A. Robert Ruesch, Esq., ME Bar No. 7145
John P. Giffune, Esq., ME Bar No. 8563
Marie J. Mueller, Esq., ME Bar No. 4757
Attorneys for Plaintiff Georges River Energy, LLC

VERRILL DANA, LLP
One Portland Square
Portland, ME 04102-4054
(207) 774-4000